[Civ. No. 14711.   First Dist., Div. One.   June 29, 1951.]

JOSEPH D. FLYNN, Respondent, v. CALIFORNIA CASKET COMPANY (a Corporation), Appellant.

198

Doyle & Clecak for Appellant.

Roth & Bahrs for Respondent.

WOOD (Fred B.), J.—Defendant, California Casket Company, a corporation, appeals from a judgment entered upon a verdict for plaintiff in an action upon a contract for the sale to defendant of shares of stock of its own issue. Defendant also appeals from an order modifying the amount of the judgment to include interest from the due date under the contract to the date of the judgment.

Appellant assigns as reversible error: (1) Insufficiency of the evidence to support the verdict and (2) the giving of assertedly erroneous and misleading instructions to the jury.

The contract between the parties was executed August 19, 1941, and amended in 1945 and 1948. During that period and until his resignation May 31, 1949, respondent was a director and executive vice-president of appellant company; hence, an officer, not an employee, of appellant. By the terms of the contract as amended, respondent gave appellant an irrevocable option to repurchase all shares of its stock acquired by respondent on and after August 19, 1941, if at any time and for any reason respondent's employment with appellant should terminate, "for a sum computed in accordance with the following formula: (a) Par value; (b) Plus or minus a sum equal to 5% of the average net earnings of First Party [appellant] for the next preceding five-year period prior to the date of termination of employment," and appellant agreed to purchase all of said shares "for said amount, for cash, within sixty days (60) after such termination."

During the period covered by the contract, respondent acquired 460 shares of the par value of $100 each. Five per cent of appellant's average net earnings for the five-year period preceding respondent's resignation, amounted to $2,389.85. The verdict and judgment were in the sum of $48,389.85. Upon motion of respondent, the trial court modified the judgment to include the sum of $1,975.89 (interest from the due date under the contract until entry of the judgment), increasing the total amount to $50,365.74.

Appellant claims legal incapacity to consummate the purchase of these shares. It invokes section 1705 of the Corporations Code, which declares that "A corporation shall not purchase directly or indirectly any shares issued by it . . ., except as authorized by Section 1706 or Section 1707," and claims that its financial condition does not bring it within any of those exceptions. A potentially applicable exception is expressed in section 1707, which declares that "A corporation may also purchase shares issued by it, . . . in any of the following cases: . . . (c) Subject to any limitations contained in its articles, out of earned surplus. Purchases under this subdivision are not limited to cases authorized under other subdivisions of this section or of Section 1706." An additional limitation imposed by section 1708 is that "A corporation shall not purchase . . . shares issued by it . . . in any case when there is reasonable ground for believing that the corporation is unable, or, by such purchase . . . will be rendered unable, to satisfy its debts and liabilities when they fall due, except such debts and liabilities as have been otherwise adequately provided for."

Appellant claims that the evidence is insufficient to support the implied findings of the jury that appellant had an earned surplus out of which to pay for these shares and that there was not reasonable ground for believing that appellant was unable, or by the purchase would be rendered unable, to satisfy its debts and liabilities when they fell due, or that appellant's debts, or any of them, had been otherwise adequately provided for.

### As to Appellant's Earned Surplus

The evidence supports the implied finding that appellant had an earned surplus out of which to pay for these shares. After respondent's resignation on May 31, 1949, appellant employed a firm of certified public accountants to make an examination of the affairs of the company and

to determine what amounts should be set up on the books of the corporation in the various categories, except only that the write-down of the casket inventory was made by appellant's division managers. This was done as of June 30, 1949. The report was accepted by appellant's board of directors without discussion and the books of the corporation were adjusted in accordance with the report. As thus adjusted, the books showed an earned surplus of $23,301.21. They also showed, as a current liability, a reserve of $44,000 for the purchase of the shares of stock involved herein, an item which, at the trial, appellant's vice-president testified and its attorney agreed should, for the purposes of this suit, go back into earned surplus. There were other items which an expert called by respondent testified were improperly set up as liabilities, and, if properly adjusted, would further increase the amount of the surplus. At the very least, the evidence shows that for the purposes of this suit appellant on June 30, 1949, had an earned surplus of $67,301.21 out of which to pay this liability of $48,389.85.

Appellant claims its earned surplus was reduced by a loss of $12,064.68 which it sustained in July, 1949. That would still leave a surplus of $55,236.53 out of which to purchase this stock, whether on August 1, 1949 (the due date under the contract), or on August 11, 1949 (the date of the commencement of suit herein).

Appellant contends that the date for determination of the amount of its earned surplus is the day the trial herein commenced, February 9, 1950, and that on that day, the evidence demonstrated, its surplus was insufficient. In support of its contention that the time of trial is the critical date, appellant cites *Goodman* v. *Global Industries,* 80 Cal. App.2d 583 [182 P.2d 300]. But the court in that case did not decide the question. After observing that the appellant therein claimed his rights should be determined as of the time he filed his suit, the court said, ''In view of the fact that appellant neither alleged nor proved the existence of an earned surplus *at any time,* the question is immaterial.'' (80 Cal.App.2d at p. 589.) Nor need we decide that question. The evidence herein would support a finding that on February 9, 1950, the appellant had an earned surplus out of which to purchase these shares.

Appellant's balance sheet for January 31, 1950, shows an earned surplus of minus $94.94. The addition of the $44,000 reserve for the purchase of these shares increases the surplus to $43,905.06 as of that date. There was a conflict of testi-

mony concerning the propriety of a reserve of $34,000 for tax liabilities of prior years, a write-down of the casket inventory in the amount of $35,000, and a reserve of $145,000 against the appliance division inventory of $172,985.08. The reserve of $34,000 was in the amount, plus interest, of a proposed additional assessment of federal income and excess profit taxes for the three fiscal years ending June 30, 1946, an assessment proposed by the government in 1947. The appellant protested the proposed assessment, was taking active measures to dispute the government's claim, and had not, prior to June 30, 1949, entered it in its books as a liability of any kind nor set up any reserve for its payment. An accounting expert called by respondent testified that under those circumstances it was not in accordance with sound accounting procedures to set that item up in the sum of $34,000 among the liabilities of the corporation, nor to set it up as a liability at all. He further testified that if the company had received information that a similar case had been decided in favor of the taxpayer (there was evidence it had) there was, according to sound accounting procedures, an obligation upon the part of the financial officers of the corporation to remove that item from the balance sheet of current liabilities and restore it to earned surplus.

The balance sheet for January 31, 1950, also showed, as a current asset, a special bank account of $33,992.88, which appellant's treasurer testified the bank had impounded; i. e., that the bank would not honor checks against that account for any purpose except for the payment of the amount set up on the books in connection with the income tax deficiency, when and if it should become due and payable. Appellant's president testified that upon January 30 or 31 the company received a letter from its attorney saying he would probably be able to settle the case for $15,000, upon the basis of which the bank, on February 1, 1950, released $18,000, reducing the special account to $15,000.

Here was evidence that would justify restoring from $18,000 to $34,000 to earned surplus. It amply supports an implied finding that, as of the date of the trial, appellant had an earned surplus of not less than $61,905.06 (minus $94.94 plus $44,000 plus $18,000), more than sufficient for the purchase of these shares. It is, therefore, not necessary to consider the additional amount, if any, which the jury may have considered available for return to surplus, based upon evidence tending to show that the casket inventory write-down and

the reserve against the appliance division inventory were excessive.

### As to Appellant's Ability to Satisfy Its Debts and Liabilities as They Fall Due

The evidence supports an implied finding that there was not reasonable ground for believing that appellant was unable, or by the purchase of these shares of stock would be rendered unable, to satisfy its debts and liabilities as they fell due.

According to appellant's own balance sheet, it had on June 30, 1949, a net worth of $1,121,459.32 (assets, $1,725,-317.19; liabilities, $603,857.87). That indicates a potential ability to pay debts as they fall due, save that if a considerable portion of the assets were frozen appellant might not be able to do so. This suggests consideration of the ratio of current assets to current liabilities, for there was expert testimony that "current assets," as an accounting term, means either cash or assets readily convertible into cash. The balance sheet for June 30, 1949, showed current assets of $866,822.68 and current liabilities of $463,407.87. There was expert testimony tending to prove needed adjustments in various items (including the $44,000 reserve for purchase of these shares and the $34,000 reserve for disputed federal tax liabilities, discussed earlier in this opinion), which, if made, would show a ratio of two to one between current assets and current liabilities. In the opinion of one of the experts, appellant had more than ample assets over liabilities to pay all its obligations, as reflected by its balance sheet for June 30, 1949. The balance sheet for December 31, 1949, reflected substantially the same condition: Total assets of $1,633,625.54 and total liabilities of $523,552.62; current assets of $809,-556.07 and current liabilities of $414,079.37.

Appellant's sales, during the last six months of 1949, grossed $762,501.74. Its cost of materials normally runs from 46 to 57 per cent of the amount of sales. This indicates that appellant's cost of materials during that period was about 51.5 per cent of $762,000,—approximately $392,000. It drew from inventory, materials valued at $50,000, indicating purchase of materials in the amount of $342,000. Meanwhile, the amount of its accounts payable did not materially increase ($116,087.89 on June 30; $113,814.94 on December 31). Upon the latter date there appeared, in addition, an item of $30,766.62 as deferred accounts payable, and $7,581.40 as other accounts payable. Deduction of the last two amounts

(less the $2,000 decrease in accounts payable) from the $342,000 indicates that during the period July to December, 1949, appellant paid current debts in the amount of $306,000, approximately.

During the same six months' period, appellant reduced its bank loans in the amount of $120,000, paying at the rate of $20,000 a month. The total amount of its indebtedness to the bank reached $400,000 in February, 1949; $250,000 unsecured, and $150,000 secured by a mortgage on San Francisco property carried at a depreciated valuation of $452,935.49. By January 31, 1950, appellant had paid $194,000 on those loans, reducing them to $206,000.

The payment of current liabilities in the amount of $306,-000, approximately, and the reduction of bank loans, secured and unsecured, in the amount of $120,000, during July-December, 1949, under the conditions described, evidently did not create in the minds of the jury a reasonable doubt concerning the ability of appellant to pay its debts and liabilities as they fell due.

But appellant directs attention to its balance sheet of January 31, 1950, which shows a substantial increase in "Trade Accounts Payable" (from $113,814.94 at the end of December to $149,430.99 at the end of January), an increase of $35,616.05. However, during January, "Deferred Accounts Payable" and "Other Accounts Payable" decreased to the extent of $7,694.43 and $608.11, respectively. This means a total increase of $27,313.51 during January, 1951. The profit and loss statement for July-January shows total sales of $899,400, in contrast to $762,000 for the six months period ending December 31, 1949, and no apparent substantial change in inventories between December 31, and January 31. The $27,313.51 increase in trade accounts payable between December 31 and January 31 need not, and apparently did not, alter the implied finding of the jury concerning appellant's ability to pay its debts as they fell due. Significant in this connection is the testimony of appellant's vice-president concerning the relation of the increase in accounts payable and the reduction of the bank loans during the seven months' period ending January 31, 1950. He testified that accounts payable did not go up nearly as much as the bank loan went down ($65,000 and $129,500, respectively) and that appellant was paying the bank at least partially at the expense of its trade creditors.

Appellant lays considerable stress upon the relation of

its cash on hand (less than $50,000) to the amount of its accounts payable and other current liabilities, as demonstrating inability to pay its debts as they fall due. True, there is a wide disparity. But the jury was entitled to, and we must assume did, take into consideration appellant's large volume of accounts receivable, which during the seven months ending January 31, 1950, ranged from $220,000 to $229,000, after deducting approximately 10 per cent as a reserve for bad debts. There was evidence, which we have noted, that accounts receivable are readily converted into cash. But, says appellant, its accounts receivable are payable in 60 days whereas its accounts payable are due in 30 days. That, testified an expert, cancels itself out in 30 days. He also testified that a corporation in the financial condition of appellant would be able to borrow money to use as a revolving fund for prompt liquidation of its accounts payable. Another factor stressed by appellant was slowness in the payment of its accounts payable. That, inferably, resulted in part from the lack of a revolving fund. The expert testified that all this was correctible by an adequate loan and other financing arrangements, including the reduction of inventory and the speeding up of the collection of receivables, and that it could be done if the receivables were sound. Our attention has been directed to no evidence in the record (and we have found no evidence) that the receivables were other than sound. Appellant claimed it was unable to borrow further from its bank, despite the ratio of its assets to liabilities and the reduction of its bank loan from $400,000 to $206,000 in one year. But its president testified they did not try to borrow further money from the bank. He said they just tried to get the bank to postpone for a while the monthly payments on the bank loan. That, evidently, did not impress the jury as a real effort to get additional moneys from their bank for revolving fund purposes, nor did it in their minds counterbalance the testimony that the additional moneys were obtainable.

The evidence presented to the jury, with the inferences which they were entitled to draw therefrom, furnished substantial support for an implied finding by them that there is not "reasonable ground for believing" that the corporation was "unable" or by the purchase of these shares would be rendered "unable" to "satisfy its debts and liabilities when they fall due." Upon that issue, a complete picture of appellant's financial condition and operations was presented to the jury. There were conflicts in the evidence. Those

conflicts the jury resolved in respondent's favor. It is not our function to reweigh them. It is essentially a question of fact.

Appellant invokes a number of definitions of insolvency, appearing in various statutes. They are not applicable here. One of them, section 3077 of the Civil Code, is patently inapplicable. It says that a buyer of goods is insolvent (within the meaning of section 3076 of the same code) "when he *ceases to pay* his debts in the manner usual with persons of his business, or when he *declares his inability* or *unwillingness* to do so" (emphasis added). There is no such expression in the statute with which we are concerned. The definition in section 3077 is appropriate to the purpose for which enacted, that of prescribing the conditions under which an unpaid seller of goods may stop the goods in transit. That definition throws no light upon the meaning of the words "unable . . . to satisfy its debts and liabilities when they fall due."

Under our statute (Corp. Code, § 1708), it is simply a question of *ability* to satisfy debts when they fall due. The fact that a corporation is overdue in the payment of some of its accounts and presently may not be operating at a profit, would be some evidence tending to show inability to satisfy debts when due. But the weight of such evidence may be overcome by evidence of other facts tending to show *ability* to satisfy debts when due. That is what the triers of fact impliedly found in the instant case, a conclusion which finds support in the evidence.

### As to Debts Otherwise Adequately Provided for

Appellant claims it had no debts that had been "otherwise adequately provided for," because there was no evidence that the payment of any of its debts or liabilities had been "assumed or guaranteed" by any "person or persons."

This claim is predicated upon the statement in section 1708 of the Corporations Code that "The payment of a debt or liability has been adequately provided for if the payment thereof has been assumed or guaranteed in good faith by a financially responsible person or persons." Appellant says this means that a debt so assumed or guaranteed is the only kind of a debt "adequately provided for," as an exception to the requirement of ability to pay debts when they fall due. We derive no such meaning from the quoted statement. The Legislature used it for the purpose of illustration and to remove any possible doubt that a debt so as-

sumed or guaranteed is "adequately provided for"; not to restrict or narrow the scope or meaning of that term. (See *Oil Workers Intl. Union* v. *Superior Court*, 103 Cal.App.2d 512, 570 [230 P.2d 71], and cases cited.) ▇ Certainly there was no intent upon the part of the Legislature to exclude from consideration a debt adequately secured by a mortgage upon real or personal property or by the pledge of personal property or by the assignment of solvent credits. ▇ Nor need a debt be secured, to be provided for. ▇ In the absence of a limitation expressed or necessarily implied (we find none in this statute), it becomes a question of fact in each case whether or not debts and liabilities have been "adequately provided for."

▇ Upon this issue, the jury had before it all the facts which it had for the consideration of the question of appellant's ability to satisfy its debts as they fall due, including, among others: Appellant has a net worth in excess of one million dollars; its total assets exceed total liabilities in the ratio of three to one; its current assets exceed current liabilities in the ratio of two to one, or better; its accounts receivable exceed its accounts payable by a wide margin; during July-December, 1949, it paid current liabilities in the amount, approximately, of $306,000, and reduced its bank loan by $120,000; and, during the year 1949, it reduced its bank loan from $400,000 to $206,000.

These and related facts, and the inferences which might reasonably be drawn from them, supported an implied finding by the jury that appellant's debts and liabilities had been adequately provided for.

### The Questioned Instructions

▇ Appellant assigns as error the giving of a certain instruction because, it claims, the court thereby erroneously told the jury that because the corporation had a large net worth it was compelled to sell its operating assets, that a liquidation should be had to repurchase the plaintiff's stock. We do not so read that instruction. It was in these words: "If you find from the evidence that at the time for performance of defendant's agreement to purchase plaintiff's stock, the defendant corporation had assets which could be converted into cash in an amount sufficient to pay its debts and liabilities as they fell due, then you may find that there was no reasonable ground for believing that the corporation was unable or by such purchase of plaintiff's stock would be unable to pay its debts and liabilities when they fall due."

The questioned instruction should be read in its context. It immediately followed these instructions: "The test to be applied by you in determining the condition of the defendant's financial affairs is not 'Will the defendant's assets on an immediate sale realize enough to pay its debts that are due and will become due?' but the true test is, 'Are the defendant's affairs in such a condition as to enable it, in the usual and ordinary course of its business, to make its payments as they fall due?' In other words, the defendant is not compelled to sell or liquidate its assets in order to place it in a position to repurchase the plaintiff's stock, if there is reasonable ground for believing that in the ordinary course of business the defendant is unable to pay its debts and liabilities as they fall due, or there is reasonable ground for believing that the defendant, by the repurchasing of plaintiff's stock, will be rendered unable to pay its debts and liabilities as they fall due. You cannot infer that the defendant California Casket Company can pay its debts and liabilities as they fall due, simply because its financial statements show an excess of current assets over current liabilities, and a net worth of $1,110,172.92. However, a corporation is not unable to satisfy its debts and liabilities when they fall due merely because it does not have cash on hand or money in the bank sufficient to pay its debts and liabilities." Viewed in its context, the questioned instruction had no such connotation as that which appellant would ascribe to it. We do not find error in this group of instructions.

The other instruction questioned by appellant reads as follows: "All of the assets of the defendant corporation, in whatever form they may be, are subject to the claims of its creditors, and, therefore, if you find that the defendant corporation has assets substantially in excess of all of its outstanding liabilities to creditors, you may find that the debts and liabilities of the corporation are adequately provided for." Appellant contends that this instruction assumes facts not in evidence, claiming that the only kind of a debt which the statute recognizes as "adequately provided for" is one that has been assumed or guaranteed by a financially responsible person or persons. That is not our view of the statute, as we have indicated. Upon oral argument, appellant's counsel conceded that if that clause of section 1708 which he invokes does not operate as a limitation, it is for the trier of facts to decide whether or not the debts and liabilities were adequately provided for. That is what the trial judge com-

mitted to the jury when he gave this instruction, to be read, of course, in conjunction with the group of instructions already discussed, a group which immediately preceded this instruction.

The judgment should be affirmed.

Concerning the order which modified the judgment to allow interest from and after the due date under the contract, appellant has made no suggestion or comment, either in the briefs or upon oral argument. We assume appellant has concluded the order was not erroneous. ▮ The applicable rule is that when a contract for the payment of money is silent as to interest, the law awards interest at the legal rate from the time it becomes due and payable, if such time is certain or can be made certain by calculation. (*Nesbit* v. *MacDonald*, 203 Cal. 219, 222. [263 P. 1007]; *Puppo* v. *Larosa*, 194 Cal. 717, 720 [230 P. 439].) The order should be affirmed.

The judgment and the order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 23, 1951. Edmonds, J., voted for a hearing.